BINKLEY MINING CO. OF MISSOURI v. WHEELER, Acting Director, Bituminous Coal Division, Department of the Interior, et al.

No. 12367.

Circuit Court of Appeals, Eighth Circuit.

Feb. 10, 1943.

Rehearing Denied March 5, 1943.

864

Henry Adamson, of Terre Haute, Ind. (Russell Blair and Lloyd C. Adamson, both of Terre Haute, Ind., on the brief), for petitioner.

Raymond G. Irvine, Chief, Compliance Proceedings Unit, Bituminous Coal Division, United States Department of Interior, of Washington, D. C. (Warner W. Gardner, Solicitor, United States Department of Interior, Arnold Levy, Gen. Counsel, and Jesse B. Messitte, Asst. Gen. Counsel, and Harry I. Rand and Erwin B. Ellmann, Dennis J. Lindsay, Attys., Bituminous Coal Division, United States Department of Interior, all of Washington, D. C., on the brief), for respondents.

Before SANBORN, WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The petition for review in this case is presented by the Binkley Mining Company of Missouri, a Code Member under the Bituminous Coal Act of 1937. It feels itself aggrieved by the order of June 4, 1942, of the Director of the Bituminous Coal Division of the Department of the Interior directing petitioner to cease and desist from selling or offering to sell coal produced by it at less than the applicable effective minimum prices established therefor, contrary to the provisions of the Bituminous Coal Code and rules, regulations and applicable price schedule thereunder. The order imposed no penalties and the Director has not applied for any order of enforcement but the petitioner feels that the Director had no right under the circumstances presented to hear or consider the charge which had been preferred against it and that his decision and order are not in conformity with the Act and are not supported by substantial evidence. Petitioner is accorded the right of review in this court by Section 6(b) of the Bituminous Coal Act, 15 U.S.C.A. § 836(b), and as its petition presents the first instance of a review in this court of a trial and action taken by the Director against a Code Member for alleged wilful violation of the Bituminous Coal Code, both parties have briefed and argued the important questions for decision with great care and thoroughness.

The statute involved is the Bituminous Coal Act of 1937, approved April 26, 1937, c. 127, 50 Stat. 72–91, 15 U.S.C.A. §§ 828–851, and extended by amendment April 11, 1941, 55 Stat. 134, 15 U.S.C.A. § 849 et seq.

The Act as initially passed was to be administered by the National Bituminous Coal Commission. However, the functions of administration of the Act were transferred from the National Bituminous Coal Commission to the Department of the Interior by Act of June 7, 1939, Reorganization Plan No. II, § 4(a) and (b), Public Res.No.20, 53 Stat. 813, 1431, 5 U.S.C.A. §§ 133s, 133t (pursuant to authority granted in the Reorganization Act of 1939, Pub. No.19, 76th Cong., 1st Sess., approved April 3, 1939, 53 Stat. 561, 5 U.S.C.A. § 133 et seq). Pursuant to order of the Secretary of the Interior, the Bituminous Coal Division is, with exceptions not here pertinent, the successor to all functions of the National Bituminous Coal Commission. (Order No. 1399 of the Secretary of the Interior, dated July 5, 1939).

The Supreme Court epitomized the objects and provisions of the Act for discussion and establishment of its constitutionality in Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L. Ed. 1263, and to clarify discussion of the points here presented it is further observed that the Act provides that producers of bituminous coal may accept membership in the Bituminous Coal Code. Producers accepting such membership are required to abide by the minimum prices established for the coals produced at their mines and to conduct their business in a manner consistent with the trade practice provisions of the Act and regulations issued thereunder. The Act imposes a 19½ percent tax on all sales of bituminous coal covered by the statute but provides that the tax shall not be applicable to the sales of coal by producers who are members of the Bituminous Coal Code. The requirements for admission into the Code are detailed in Section 4 of the Act.

Pursuant to the statutory direction contained in Section 4 Part II of the Act, the Director, following lengthy public hearings, promulgated schedules of effective minimum prices for the coals produced by Code Members in the various production districts. Coincident with the establishment of minimum prices, the Director issued marketing rules and regulations designed to implement the minimum prices by controlling various aspects of the sale of coal.

Section 4 II (e) provides that the sale or delivery or the making of a contract for the sale of coal by code members at a price below the minimum established by the Division shall constitute a violation of the code.[1] A schedule of Effective Minimum Prices for District No. 15 for All Shipments Except Trucks was established and in effect from October 1, 1940, to March 31, 1941, providing in Price Instruction No. 9 Part I:

"Domestic and Commercial Use and Industrial Use.

"(a) Prices shown for Domestic and Commercial Use apply (1) on all sales in retailing of coal. (2) On all sales of coal to consumers using coal principally for space heating. (3) On all other sales except Industrial Use as provided for in Part II Special Purpose Use and Part III Railroad Locomotive Fuel Use.

"(b) Prices in the Industrial Use Schedule apply only where sale is made by the Producer Code Member, his authorized agent, or a registered wholesaler or jobber and where the coal moves direct from the mine of the producer to the consumer using the fuel principally for (1) the purpose of driving steam engines or turbines, (2)

---

[1] "Sec. 4 II [§ 833]. * * * (e) No coal subject to the provisions of this section shall be sold or delivered or offered for sale at a price below the minimum or above the maximum therefor established by the Commission, and the sale or delivery or offer for sale of coal at a price below such minimum or above such maximum shall constitute a violation of the code: Provided, That the provisions of this paragraph shall not apply to a lawful and bona fide written contract entered into prior to June 16, 1933.

"The making of a contract for the sale of coal at a price below the minimum or above the maximum therefor established by the Commission at the time of the making of the contract shall constitute a violation of the code, and such contract shall be invalid and unenforceable.

"From and after the date of approval of this Act [April 26, 1937], until prices shall have been established pursuant to subsections (a) and (b) of Part II of this section, no contract for the sale of coal shall be made providing for delivery for a period longer than thirty days from the date of the contract.

"No contract shall be made for the sale of coal for delivery after the expiration date of this Act [subchapter] at a price below the minimum or above the maximum therefor established by the Commission and in effect at the time of making the contract."

the purpose of manufacturing or processing if fuel is required each day of the year products of the consumer are produced."

Section 4 II (j) authorizes the Division to hear and determine written complaints made by certain parties charging any violation of the Code specified in Section 4 Part II and to make such orders as the facts and the circumstances warrant.[2]

Section 5 (b) provides that upon written complaint ·by any code member, district board,[3] State or political subdivision of a State, or the Consumers' Counsel, the Division, after a hearing with thirty days' written notice to the code member and "upon proof that such [code] member has wilfully violated any provision of the code or any regulations made thereunder," may revoke his code membership or, in its discretion, may order the code member to cease and desist from violations.[4]

Section 6 (a) makes all the regulations and determinations of the district boards subject to review by the Division upon proper appeal to it, and provides that in the event a district board fails for any reason to take action authorized or required of it under the Act, then the Division may take such action in lieu of it.[5] Certain actions of the district boards are subject to supervision of the Division by the provisions of Sections 4 I (a) and 4 I (b), 15 U.S.C.A. § 832 (a, b).

Section 6 (b) provides in part that "the finding of the [Commission] Director as to the facts, if supported by substantial evidence, shall be conclusive", upon review thereof by the Circuit Court of Appeals.

---

[2] "Section 4 II [§ 833]. * * * (j) The Commission shall have jurisdiction to hear and determine written complaints made by any code member, district board, or member thereof, State or political subdivision of a State, or the consumers' counsel, which charge any violation of the code specified in Part II of this section. It shall make and publish rules and regulations for the consideration and hearing of any such complaint, and all interested parties shall be required to conform thereto. The Commission shall make due effort toward adjustment of such complaints and shall endeavor to compose the differences of the parties, and shall make such order or orders in the premises, from time to time, as the facts and the circumstances warrant. Any such order shall be subject to review as are other orders of the Commission."

[3] The Act provides for the establishment of so-called district boards composed of representatives of producers in each of the bituminous coal producing districts, together with a representative of a labor organization representing employees of coal producers in the district. Various rights as well as duties of the district boards are enumerated in the Act.

[4] "Section 5 [§ 835]. * * * (b) The membership of any such coal producer in such code and his right to an exemption from the taxes imposed by section 3(b) of this Act [Section 830(b) of this subchapter], may be revoked by the Commission upon written complaint by any code member or district board, or any State or political subdivision of a State, or the consumers' counsel, after a hearing, with thirty days' written notice to the member, upon proof that such member has willfully violated any provision of the code or any regulation made thereunder; and in such a hearing any code member or district board, or any State or political subdivision of a State, or the consumers' counsel, or any consumer or employee, and the Commissioner of Internal Revenue, shall be entitled to present evidence and be heard: Provided, That the Commission, in its discretion, may in such case make an order directing the code member to cease and desist from violations of the code and regulations made thereunder and upon failure of the code member to comply with such order the Commission may apply to a circuit court of appeals to enforce such order in accordance with the provisions of subsection (c) of section 6 [section 836] or may reopen the case upon ten days' notice to the code member affected and proceed in the hearing thereof as above provided."

[5] "Section 6 [§ 836]. (a) All rules, regulations, determinations, and promulgations of any district board shall be subject to review by the Commission upon appeal by any producer and upon just cause shown shall be amenable to the order of the Commission; and appeal to the Commission shall be a matter of right in all cases to every producer and to all parties in interest, including any State or any political subdivision thereof. In the event that a district board shall fail, for any reason, to take action authorized or required by this Act [subchapter], then the Commission may take such action in lieu of the district board. The Commission may also provide rules for the determination of controversies arising under this Act [subchapter] by voluntary submission thereof to arbitration, which determination shall be final and conclusive."

## Statement.

Although the record before us discloses that there were two complaints against the petitioner, each charging sales of coal by it in violation of the Code at different times to different customers, and that the Examiner heard evidence as to both at the same time and reported as to both in the same report, and that the Director acted upon both at the same time and in the same cease and desist order, the petitioner has filed separate petitions for review. This petition in No. 12,367 is for review of the Director's action, in so far as it is based on the complaint, proceedings, evidence and report respecting only the sales by petitioner to its customer, Western Tablet and Stationery Company of St. Joseph, Missouri.

On June 12, 1941, Bituminous Coal Producers' Board for District No. 15, through its secretary, H. V. Blackburn, filed its complaint against petitioner in which it alleged upon its own knowledge and on information supplied by E. J. Lytton, Consuming Area Auditor, Bituminous Coal Division, Department of the Interior, that the Code Member, Binkley Mining Company, wilfully violated the provisions of the Code and the effective minimum prices by selling approximately 540 tons of Bee-Veer 1″ washed mill coal from October 1, 1940 to March 31, 1941, produced at Bee-Veer Mine, Macon County, Missouri, to Western Tablet and Stationery Company, located at St. Joseph, Missouri, shipped via rail to St. Joseph, Missouri, at $1.63 per ton, f. o. b. the mine, that this alleged violation was accomplished by "giving/offering" a price 12 cents less than the prescribed minimum price; that the following is a more detailed description of the alleged violation: Coal sold to Western Tablet and Stationery Company, St. Joseph, Missouri, a commercial concern, at the industrial price of $1.63 per ton. The complaint contained a prayer that the membership of the member be revoked or that in the discretion of the Division the member be directed to cease and desist from violations of the Code. Section 4 II (e) of the Act and of the Code provides, as indicated, that no coal subject to the code shall be sold or delivered or offered for sale "at a price below the minimum * * * therefor established by the Commission, and the sale * * * of coal at a price below such minimum * * * shall constitute a violation of the code"; and the specification of the acts in the complaint sufficiently charged a wilful violation.

On consideration of the complaint the Director ordered that a public hearing in respect to its subject matter be held on September 10, 1941, and caused notice to be given. On August 2, 1941, the petitioner filed an answer of general denial. Thereafter before the date of hearing District Board No. 15 filed a petition to withdraw its complaint and cancel the scheduled hearing. It stated that it had considered the evidence on which the complaint was based and the statement of a representative of petitioner and was of the opinion that the violation alleged was not wilful and stated that by unanimous resolution attached to the petition it had directed withdrawal of the charge. The Director fixed a date for hearing the petition to withdraw the charge and gave notice. After hearing, he found that good cause had not been shown and that proper administration of the Act required hearing of the charge and ordered that the District's petition be denied without prejudice to its renewal before the Director after the close of the hearing on the charge.

The scheduled public hearing was thereupon held before the Trial Examiner of the Division and the complainant Board and petitioner appeared and filed a joint stipulation for dismissal signed by the complainant and this petitioner, which the Examiner stated would be received and referred to the Director. The Secretary of the District Board, appearing on its behalf, inquired whether its application to withdraw charges would become part of the record of the proceedings before the Examiner, and on being informed it would not, he caused the Board's petition for withdrawal of complaint and record of its meeting and resolution to withdraw the complaint, and the stipulation for dismissal, to be identified and introduced in evidence. In response to the Examiner's inquiry whether there was any further procedure on the part of the complainant District Board, he answered in the negative. Thereupon a member of the Office of General Counsel of the Division introduced, and the Examiner heard, the evidence on behalf of the Division intended to support the charge, and cross-examination and evidence by petitioner in defense. The witnesses were the vice-president and general

manager and the salesman of petitioner, and the purchasing agent and the mechanical engineer of its St. Joseph customer.

There was substantial evidence that the petitioner operates the Bee-Veer Mine located in Macon County, Missouri, designated as Mine Index No. 13 in District No. 15. It voluntarily accepted membership in the Code and at all times pertinent to this proceeding was a member of the Code. Its customer, Western Tablet and Stationery Company, has its main plant at St. Joseph, Missouri, and consumes approximately from 2,000 to 2,500 tons of coal annually. Although part of the coal is used for processing glue and the use for that purpose is continuous every day the plant is in operation, the larger part of the coal it consumes is used to heat its three buildings in cold weather which prevails from October through March.

Between October 1, 1940, and March 31, 1941, petitioner, through its sub-sales agent, Binkley Coal Company, sold to the Western Company approximately 540 tons of 1¼" washed mill coal (designated in the price schedule of the Division as Size Group 13) at a price of $1.63 per net ton f. o. b. the mine. This coal was sold pursuant to a contract entered into on April 1, 1940, for a term of 30 days, renewable each 30 days and terminable upon the establishment of minimum prices under the Coal Act, or March 31, 1941, whichever occurred first; in accordance with the rules and regulations of the Division and Section 4 II (e) of the Act, the contract was made subject to all of the provisions of the Act and provided specifically that when minimum prices were established pursuant to the Act the contract might be renewed at the then effective minimum prices.

It had been petitioner's practice, even before minimum prices were established by the Division, to sell coal to domestic or commercial consumers at prices different from those applicable to industrial consumers. At the time the contract with the Western Company referred to above was entered into, petitioner considered the Western Company an industrial consumer in accordance with the classification embodied in the price list of Southwestern Coal Company, the marketing agency of which it was a member and through which it sold its coal. The rules of that agency provided that consumers using fuel each day for processing or manufacturing were to be classified as industrial consumers.

The minimum price schedule promulgated by the Division pursuant to the price provisions of the Act and effective on October 1, 1940, also provided for classification of consumers, in accordance with the marketing practice of the region in which petitioner marketed its coal. The Division's classification of consumers, however, differs from the classification apparently embodied theretofore in the price schedule of Southwestern Coal Company; in addition to the provision that in order to make the industrial classification applicable the fuel must be needed each day of the year when products of the consumer are produced, it required that the coal be used principally for the purpose of manufacturing or processing.

Under the provisions of the Division's price schedule, in the light of the provisions of Price Instruction No. 9 (supra), the effective minimum prices applicable for shipment of petitioner's 1¼" washed mill coal, during the period October, 1940, through April, 1941, to Western for use in its St. Joseph plant, was $1.75 per net ton f. o. b. the mine. The price of $1.63, at which petitioner sold the coal in question, was the minimum price then effective for industrial use.

The witness William G. Gregory, vice president of Binkley Mining Company and of its sub-sales agent, Binkley Coal Company, and general manager of the western division for Binkley Coal Company, was directly in charge of the sale of petitioner's coal to Western during the period in question. Binkley Mining Company produces about half a million tons of coal a year. Gregory was at that time and still is, an active member of the Bituminous Coal Producers Board for District No. 15, familiar with the Schedule of Effective Minimum Prices for District No. 15, the Marketing Rules and Regulations, and particularly the provisions of Price Instruction No. 9. When the schedules of minimum prices became effective in October, 1940, petitioner sent copies of the Division's rules and regulations and prices and incidental information to all its salesmen, advising them to study such rules and provisions carefully and comply with the law in every respect. The witness Thomas W. Ziph, one of the salesmen under Gregory's supervision and the salesman representing petitioner in the sales to the St. Joseph company, was likewise aware of the price schedule, price instructions and marketing

rules of the Division. Ziph testified it was his understanding "that the larger portion of the coal that they [the St. Joseph company] use [in the St. Joseph plant] was for heating their buildings." Mr. Gregory testified that at the time the sale of coal was made and during the period of performance he had no information or knowledge that the customer was not an industrial plant entitled to industrial prices. He ascertained the fact after the sales herein and raised the price to conform. He said he had no intention to violate the lawfully fixed price.

The Examiner submitted his report and recommendations on February 25, 1942. He found that petitioner had made the sales of coal as described in the complaint at a price of $1.63 per ton f. o. b., though such coal was principally used for domestic purposes for which the applicable minimum price was $1.75 f. o. b. the mine, and concluded that the petitioner had wilfully violated the provisions of the Act, the Code, the Schedule of Effective Minimum Prices for District No. 15, and the Marketing Rules and Regulations.

In a Memorandum Opinion filed June 4, 1942, the Director stated that he had examined the record in the proceeding; that as the jurisdiction of the Division had been regularly invoked by the filing of the complaint by District No. 15 charging violation of the Act, and the District Board was authorized under the Act to present evidence concerning the alleged violation but had failed to take action authorized by the Act, it was the function and responsibility of the representative of the General Counsel's office of the Division to insure that an adequate record was made upon the basis of which the Director could determine whether or not the alleged violation was committed. He adopted as his own the findings and conclusions of the Examiner, found that the omission on the part of petitioner to determine the use to which its coal was being put by its customer was sufficiently flagrant to amount to a wilful disregard of the provisions of the Act, the Code, the price schedules and the Marketing Rules and Regulations, and entered the cease and desist order of which the petitioner complains.

## Opinion.

It is contended for petitioner (1) that the Bituminous Coal Act of 1937 contemplates regulation of the coal industry by the industry itself under supervision of the governmental agency and that the Act does not confer upon the Division the power which the General Counsel's Office of the Division assumed in this case to appear as prosecutor of the complaint which had been filed by the Board for District No. 15 and go forward with the introduction of evidence to sustain such complaint. It contends that the Board for the District had the right to withdraw its complaint and to dismiss prior to hearing, and that having done so, the subsequent proceedings were unauthorized. It also contends (2) that no sufficient facts were found by the Director to justify his conclusions and that there is no substantial evidence to support the order.

(1) The Provisions of the Act do disclose clearly that it was the intention of Congress that those who are engaged in the coal industry and who become members of the Code established by the Act shall co-operate among themselves and with the government agency to aid in the accomplishment of the "stabilization of the industry primarily through price fixing and the elimination of unfair competition." It is to that end that "some twenty district boards of code members are provided for, which are to operate as an aid to the Division", and that such boards are given power to lodge complaints and invoke action by the Director against members for violations of the code or any regulation made thereunder.

But it also is apparent from the Act that the establishment of the agency for its administration and enforcement is to protect the common national interest and promote public order by regulating and adjusting the frequently conflicting interests of localities, producers, distributors and consumers of bituminous coal to the national interest. The Act nowhere indicates that the administrative action which it provides for, including the proceeding here involved, is designed merely to adjudicate the disputes between private litigants. It plainly recognizes that the fixing and maintaining of coal prices is an intricate and difficult function, to be accomplished with the cooperation of the industry, but that the ultimate responsibility for such price fixing and maintenance is lodged with the Division. It issues the rules and regulations to implement and enforce fixed prices and it is given powers appropriate to that end. It investigates concerning possible infractions and is the administra-

tive forum for the hearings where the facts may be developed. It reviews and supervises and though no crimes are defined in the Act, final disciplinary action appropriate to bring about and maintain obedience to the Act can emanate only from it.

■ Accordingly, the answer to the question here presented is not to be found in the decisions of civil actions between private parties. Though the courts in those cases have in the absence of controlling statute, liberally extended to plaintiffs the privilege of dismissing a case before trial, the considerations on which they do so are different from those which confront an administrative agency charged with the duty of administering and enforcing a public Act such as is involved here. In this case there were other interests involved than those of District Board No. 15 and this petitioner. There was the public interest in the enforcement of the requirements of the Act. The prohibition of the Act against cutting fixed coal prices applies nationally to all code members alike and it is exclusively for the Division to determine the true facts concerning possible violations and to prescribe appropriate disciplinary measures. The matter is a public one, not private.

■■ It is unnecessary to determine in this case, as contended for petitioner, that there is no way under the Act for the Division to take cognizance of an alleged wilful violation by a Code member except upon complaint of a District Board or others specified in Section 5(b). Here a sufficient complaint in writing was duly lodged by the District Board with the Division and the Division became empowered and it was its duty to take cognizance of it. It did so, and made appropriate provision to have the matter heard. The Board was authorized to introduce evidence on its complaint and when it failed to offer any proof to support its charge it must be deemed to have "failed to take action which it was authorized to take" within the meaning of Section 6(a). In that situation it was within the discretion of the Division to cause the proof to be offered and to have the matter proceeded with. The public interest and the statute alike compelled the Division to exercise its discretion and to act accordingly. Neither the petitioner nor the local board nor both in concert could control the public interest by stipulation or dismissal. Sunshine Anthracite Coal Co.

v. National Bituminous Coal Commission, 8 Cir., 105 F.2d 559, loc. cit. 566; Resources Corporation International v. Securities and Exchange Commission, 1939, 70 App.D.C., 58, 103 F.2d 929. See also Oklahoma-Texas Trust v. Securities and Exchange Commission, 10 Cir., 100 F.2d 888, 892; Securities and Exchange Commission v. Hoover, D.C.N.D., Ill., 25 F.Supp. 484; In the Matter of Winnebago Distilling Co., 6 S.E.C. 926; In the Matter of Paper Sales Co. of Detroit, Inc., 2 S.E.C. 748.

■ (2) On the evidence presented before him the Examiner found the facts against the petitioner in substantially the words of the complaint. He also set forth and discussed the material and controlling parts of the testimony from which he concluded that the violation which he found the petitioner had committed, was wilful. The Director examined the record, considered and passed upon the exceptions of petitioner, and having adopted the findings and conclusions of the Examiner as his own, also specifically found that petitioner's violation was wilful. We think that the finding that petitioner committed the violation as charged is sustained by the evidence but recognize that the question whether it was wilfully done is not without difficulty. As stated for petitioner, the word "wilful" in the Act and in the complaint is a forcible word and carries with it in the connection here something more than a mere mistake made in the course of sales of half million tons of coal in the year. We may not ignore the statement of counsel that the coal industry had thousands of different prices, hundreds of areas for hundreds of different kinds and classifications of coal, and that the pricing of coal was indeed an intricate and difficult function.

On the other hand, as stated by the Director, there was evidence noticed by the Examiner that petitioner had sold coal to its St. Joseph customer to its plant for several years and had always distinguished between industrial and commercial use in pricing its coal. Petitioner's salesman said that he called on the St. Joseph customer over a period of four years selling them coal, and when asked how often he would call on them, answered "sometimes it would be a matter of ten days, maybe two weeks. I would say an average of about once every three weeks, two or three weeks." He said, "I understand that the larger portion of the coal they use was for heating their

buildings." He supposed so from the records of shipments, more shipments being made in the colder months than in the summer. He quoted them the industrial price because they had always bought on the industrial price. But though he knew the price schedule applicable at the time of the sale in question prohibited industrial prices to those using coal principally for space heating, he made no investigation to ascertain whether the customer was then entitled to the industrial price at which the sales in question were made. He stated that there was always competition for the business.

The Director considered a contention made for petitioner that it was not its obligation to determine whether coal is to be sold at the industrial or commercial price, and stated:

"The contentions of Code Member are without merit. The proscription of Section 4 II (e) of the Act against selling coal at less than the effective minimum prices requires of the producer, in cases where the effective minimum prices vary according to the use to which the coals are to be put, that he ascertained whether such use is commercial or industrial and that he price his coal accordingly. Proper enforcement of the Act would be impossible were producers permitted to sell coals, indifferently and negligently omitting to determine such a vital factor upon which the effective minimum prices are based. Such omission on the part of the Code Member is sufficiently flagrant in view of its failure, despite knowledge of the requirements of the District No. 15 price schedule, to make any effort to determine the use to which the coals were to be put, to amount to a wilful disregard of the provisions of the Act, the Code, the price schedules, and the Marketing Rules and Regulations, and I so find."

▮ We must attribute to the Director a more intimate knowledge of the minutiae of the business of selling coal under the operation of the Code than this court may obtain from the meager record before us. The meaning which should be given to the word "wilful" in the Act in its context is not that evil purpose, criminal intent or the like, which is implied in indictments for crime involving moral turpitude. It was designed to describe the attitude of a Code Member skilled in the coal selling art and familiar with its practice, who, having a free will and choice, intentionally and knowingly either omits to do what is required of him in disregard of the code provisions, Spies v. United States, 63 S.Ct. 364, 87 L.Ed. ——, decided January 11, 1943, or acts affirmatively with manifest indifference to its requirements. A Member of the Code ought not to be absolved of a wilful violation of the price requirements of the Code on his plea of ignorance of one of the essential factors for determining the price at which he might lawfully sell his coal. Under the circumstances, inquiry becomes a duty, and he may reasonably be charged with the knowledge he would have obtained had the required inquiry been made. A violation of the Code by a Code Member, due to his failure to know what he was in duty bound to know, is as serious and as detrimental to other Members of the Code and to the public interest as a deliberate violation. While infractions due to excusable neglect or mere mistake should not be classed as wilful, there would be no justification for excluding from the category of wilful violations infractions which are inexcusable either because a Member acted deliberately or in plain disregard of his duty to inform himself before acting.

▮ The principle which runs through the cases is that the meaning of wilfulness should ordinarily be determined by reference to its context in the statute in which it is used. Moreover, it is fundamental that a statute must be construed in light of the purposes it seeks to achieve and the evils it seeks to remedy; and that remedial legislation is entitled to a broad interpretation so that its public purposes may be fully effectuated. United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345, and cases cited; South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. Accordingly, the meaning of "wilful" in Section 5(b) must be determined by reference to the broad objectives of the Act and the duties of a Code Member thereunder and the nature of the proceedings provided to enforce the Act.

▮▮ The petitioner complains of the lack in the record of proper specification of the elements upon which the Director's conclusion of wilfulness was based, i. e., a lack of findings of evidentiary facts, which facts alone or together were deemed to

show wilfulness. Both the report of the Examiner and the opinion of the Director should be criticized for their disorderliness in that both have failed in several instances to follow up their discussion of evidence with explicit findings of the evidentiary facts deduced from such evidence. But the ultimate facts found and the conclusions are explicitly stated and the comparatively brief testimony is in the record before us and we have carefully examined it. We cannot say that there is no substantial evidence to support the finding of the Director that petitioner wilfully violated the Code as charged.

The petition herein is denied.